HUNTSMAN–CHRISTENSEN CORPO-
RATION, a Utah corporation, Ladd E.
Christensen, an individual; and A.
Blaine Huntsman, Jr., an individual,
Plaintiffs,

v.

ENTRADA INDUSTRIES, INC., a
Delaware corporation, et al.,
Defendants.

Civ. No. C86–530G.

United States District Court,
D. Utah, C.D.

July 14, 1986.

Jay D. Gurmankin, Salt Lake City, Utah, for plaintiffs.

James B. Lee, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came on regularly for hearing on July 8, 1986, on defendants' Motion to Extend Order Sealing Complaint. Plaintiffs were represented by Jay D. Gurmankin and defendants were represented by James B. Lee. The parties submitted written memorandums to the Court and counsel for the parties presented oral argument, after which the Court took the matter under advisement. Having reviewed the file and the authorities relied upon by the parties, the Court hereinafter renders its Memorandum Decision and Order.

## FACTUAL BACKGROUND

Plaintiffs filed their Complaint on June 20, 1986. In conjunction with that filing, *plaintiffs* sought and obtained from Judge Winder of this Court an Order Sealing the Complaint for two weeks until July 3, 1986, which by agreement of all counsel was extended until July 8, 1986, at which time *defendants'* Motion to Extend the Order Sealing the Complaint was heard. After argument, the Court directed that the Complaint remain under seal pending decision on defendants' Motion.

The Complaint herein contains allegations that defendant Questar Corporation and its subsidiaries, including Mountain Fuel Supply Company, have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In addition, it is alleged that Mountain Fuel Supply Company is liable pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") for hazardous waste contamination of several sites in the Salt Lake City area. At the time plaintiffs filed their Complaint, they felt that because of the sensitive and high profile nature of the claims against these particular defendants, it would be appropriate for the Court to seal the Complaint for a short period of time in order to facilitate a positive environment for settlement negotiations and a speedy resolution of the matter. It was felt that public exposure of the case, especially that assisted by the media, would inhibit the negotiation process and result in potentially protracted litigation. Defendants perceive plaintiffs' voluntary acquiescence in sealing the Complaint to constitute undue pressure for an unwarranted settlement or payment. In any event, the parties have not resolved their differences through successful settlement negotiation during the time that the Complaint has been under seal. Defendants now seek an extension of the Court's Order Sealing the Complaint until such time as the Court can rule on a contemplated but yet-to-be filed Motion to Dismiss. Defendants assert the following arguments in support of their motion: First, that the Complaint contains allegations concerning claimed RICO and RICE (Utah Racketeering Influence and Criminal Enterprise Act) violations which are wholly unfounded, which were brought to force settlement through pleading intimidation, and which constitute sensitive and highly prejudicial claims to the entities and individuals named; second, that making public allegations of a scheme to defraud the government, of mail and wire fraud, of massive contamination and widespread pollution and of engaging in a pattern of racketeering activity potentially would result in great harm to public as well as private interests. Defendants assert that no countervailing public interest exists which would support removing the seal, at least until the Court has the opportunity to rule on defendants' Motion to Dismiss.

Plaintiffs, who obtained the initial Order to Seal the Complaint, strongly oppose defendants' Motion. Plaintiffs assert that their original Motion was based on a desire timely to dispose of the matter through settlement negotiations in a relatively neutral atmosphere. That possibility having vanished, plaintiffs assert that no sound legal or policy reason exists to keep the Complaint under Seal. Plaintiffs assert that a strong presumption exists in favor of public access to Court records, that defendants have the burden to overcome the strong presumption and that defendants' proferred reasons for keeping the Complaint sealed are not in the public interest and otherwise are not persuasive. No member of the public or media has intervened in this case for the limited purpose of opposing defendants' Motion.

## ANALYSIS

The parties have not cited to the Court any case involving a defendant's attempt to deny the public access to a filed Complaint, or knowledge of the very circumstances of a publicly filed lawsuit. The Court through internal research also has been unable to find such a case. However, several courts have addressed sufficiently sim-ilar problems as to give this Court meaningful guidance in analyzing the immediate problem.

The Tenth Circuit has acknowledged and followed the well recognized axiom that "a common law right exists to inspect and copy judicial records." *United States v. Hickey,* 767 F.2d 705, 708 (10th Cir.) (citing *In re Knight Publishing Co.,* 743 F.2d 231, 235 (4th Cir.1984); *In re National Broadcasting Co.,* 653 F.2d 609, 612 (D.C. Cir.1981)), *cert denied sub. nom. Hopkinson v. United States,* —— U.S. ——, 106 S.Ct. 596, 88 L.Ed.2d 559 (1985). *See also Nixon v. Warner Communications,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1311–12, 55 L.Ed.2d 570 (1977) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents"). Many reasons exist for that common law right, including keeping a "watchful eye on the workings of public agencies," *Nixon,* 435 U.S. at 598, 98 S.Ct. at 1312, publishing "information concerning the operation of government," *id.,* and "preserving the integrity of law enforcement and judicial processes," *Hickey,* 767 F.2d at 708 (citing *United States v. Hubbard,* 650 F.2d 293, 315 (D.C. Cir.1980)).[1]

1. Some courts have suggested additional, and somewhat elevated, support for the common law right of access to trial materials. For example, in the case of *United States v. Criden,* 648 F.2d 814 (3d Cir.1981), the court addressed the issue of whether a trial court had abused its discretion in denying a television network physical access to video and audio tapes for copying, even though the trial was open and the network had transcripts of the tapes. After distinguishing the common law right from First Amendment rights (*See infra* note 2), the court stated:

> [W]e believe that some of the same policy considerations identified as supporting open trials may be considered when the issue involves common law right of access to trial materials.

648 F.2d at 820. That court proceeded to discuss the historical analysis given to public access to criminal court proceedings by the Supreme Court in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and reiterated the Supreme Court's justifications, which tend to implicate the First Amendment. 648 F.2d at 820. Finally, the court stated that "the analyses in *Richmond Newspapers* of the public's right to an open trial provide strong support for reliance on the common law right of access to trial materials in this case." *Id.* at 821–22.

The Sixth Circuit, however, is somewhat critical of the elevated justification given the common law right in *Criden* by the Third Circuit. In *United States v. Beckham,* 789 F.2d 401 (6th Cir.1986), the Sixth Circuit addressed the identical question posed in *Criden,* whether the trial court had abused its discretion in denying physical access to tapes, the contents of which the petitioners were fully aware. The court found that the "legal underpinnings of the two rights [open trials and physical access to court materials] are significantly distinct." *Id.* at 413. The court stated:

> The extended discussion of *Richmond Newspapers, Inc. v. Virginia* in the [*Criden* ] opinion, albeit accompanied by disclaimers, has an unfortunate tendency to conjure up constitutional confusion about the right of access at issue here....

*Id.* (quoting *Criden,* 648 F.2d at 83 (Weis, J., concurring and dissenting)). The court found that the policy considerations that support the constitutional right to open trials are different

The cases are equally clear that the common law right is not absolute. *See, e.g., id.* Courts have supervisory powers over their own files and records, *id.; Crystal Grower's Corp. v. Dobbins,* 616 F.2d 458, 561 (10th Cir.1980), and have discretion to seal court documents "if the public's right of access is outweighed by competing interests." *Hickey,* 767 F.2d at 708 (quoting *In re Knight Publishing Co.,* 743 F.2d at 235). That discretion is not unlimited, however. "The court must consider the relevant facts and circumstances of the parties." *Id.* In *Nixon* the Supreme Court suggested "that the factors to be weighed in the balancing test include whether the records are sought for improper purposes, such as promoting a public scandal or unfairly gaining a business advantage; whether release would enhance the understanding of an important historical event; and *whether the public has already had access to the information contained in the records. In re Knight Publishing Co.,* 743 F.2d at 234 (citing *Nixon,* 435 U.S. at 597–608, 98 S.Ct. at 1311–17) (emphasis added).

 Many of the cases which address the common law right to inspect and copy judicial records involve situations where the public and press already are aware of the underlying facts and circumstances contained in the records to which they seek physical access. For example, in *Nixon,* Warner Communications, Inc. sought access to and copying of 22 hours of taped conversations that had been played for the jury and the public in the courtroom during the trial of seven individuals involved in the so-called Watergate conspiracy. The pros-

ecutor at trial had supplied the jurors, reporters and members of the public with transcripts of the tapes that were played. Several weeks after the trial had begun, Warner Communications sought permission to copy, broadcast and sell to the public those portions of the tapes played at trial. District Judge Sirica denied Warner's request and the Court of Appeals for the District of Columbia Circuit reversed. 435 U.S. at 592–96, 98 S.Ct. at 1309–11. The United States Supreme Court reversed the Circuit. After discussing the relative merit of the interests advanced by the parties, the Court recognized as applicable to that case the existence of an additional, unique element which eliminated the need to balance the interests of the parties. 435 U.S. at 606, 98 S.Ct. at 1316. That element was the Presidential Recordings Act which provided an alternative, although somewhat protracted, means of public access. The Court carefully pointed out, however, that the public had not been denied access to information but was only being denied physical access to court records. Under those circumstances, and without the application of the Presidential Recordings Act, the Court "would be faced with the task of weighing the interests advanced by the parties in light of the public interest and the duty of the Courts." *Id.* at 602, 98 S.Ct. at 1314 (footnote omitted). *See also United States v. Beckham,* 789 F.2d 401 (6th Cir.1986) (complete access of the media and public to all proceedings reduces the need or immediacy of physical access to court records, the contents of which the public is aware, and implicates only the common law right of access). Because the

from the public's and media's right to gain physical access to court materials. *Id. But see Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d 1165 (applying the principles set forth in *Richmond Newspapers* that support a constitutional requirement of open criminal trials, to a determination of whether to permit public access to *information* contained in court documents in a civil case), *reh'g denied,* 717 F.2d 963 (6th Cir.1983).

This court is of the opinion that a right of access to court materials in a civil case is governed by common law principles where the petitioner or public already is aware of the underly-

ing facts relating to the materials. A court may exercise considerable discretion in balancing the interests of the parties, the public and the judicial process. However, where denial of access to court materials leaves the public wholly uninformed of the general contents of the materials, the policy considerations underlying the constitutional requirement of open courtrooms, which are different and more elevated, appear to apply. That situation may call for a curtailment of the court's discretion, and the party attempting to prevent access to the information would have a more difficult burden. *See infra* note 2.

media was aware of the contents of the records, the only issue before the courts in *Nixon* and *Beckham* was "not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the [court records]—to which the public has never had *physical* access— must be made available for copying." *Nixon*, 435 U.S. at 609, 98 S.Ct. at 1318 (emphasis in original).[2]

■ This Court recognizes the common law presumption favoring public access to judicial records. That right is not absolute, however, so in exercising discretion whether to deprive the public access to court records, there should be a judicial balance of the legitimate, competing interests of the parties and the public based on the particular circumstances of the case. When denial of access to court records deprives the public of information or the ability to know, a stronger presumption of

access arises and the Court's discretion is significantly curtailed.

In light of these principles, the Court is persuaded that the Complaint should not remain sealed and that its Order sealing the file should be lifted.[3] Defendants have the burden of overcoming the common law presumption favoring public and media access to court records, of which the Complaint in this case is one.[4] Analysis of the competing interests reveals that the defendants have failed to meet that burden. Defendants first contend that the allegations are unfounded and false and are brought to intimidate. However, that argument alone is not relevant to the question of public access to the Complaint. As has been said on many occasions, it is one thing to allege a cause of action but it is another thing to prove it. Defendants will have ample opportunity to respond to plaintiffs' Complaint. Falsity, baselessness and

**2.** In addition to the common law right of access to court records, a constitutional right of access may exist where denial of access obstructs the free flow of information or prohibits the public's ability to know. *United States v. Beckham,* 789 F.2d at 409. Clearly, where the public and press are permitted access to court proceedings that do not prohibit the viewing of or listening to documents, reports, audio or video tapes or live witnesses, denying the public and media physical access to the court records would not obstruct the free flow of information or the public's ability to know. *See id.* at 408–09; *see also Nixon,* 435 U.S. at 608–10, 98 S.Ct. at 1317–18. In that situation, any right of physical access to the court records necessarily would arise only from the common law. However, where denial of access would result in depriving the public information to which the public generally is constitutionally guaranteed access, a party seeking concealment of the record would have a much more difficult burden to overcome.

To determine what right or rights are implicated, the court should determine what information would be denied to the public if the court were to conceal its records. As shown by *Nixon* and *Beckham,* where the contents of the records sought generally are already known by the media and the public (through attendance at trial, supplied transcripts, etc.), knowledge and free flow of information is not being denied and fundamental First Amendment rights would not be infringed by curtailing public access. Only the common law right to inspect and copy judicial records would be curtailed. However,

where a "deprivation of access to information occurs due to an exclusion from judicial records, the constitutional right to know is implicated." *Beckham,* 789 F.2d at 414 (citing *In re Knoxville News-Sentinel, Inc.,* 723 F.2d 470, 476 (6th Cir.1983) ("only the most compelling reasons can justify non-disclosure of judicial records" where the public is barred from learning the facts of a dispute)). Thus, a court would have more discretion in balancing factors where the records sought would simply duplicate information already made available to the public and media, where the information sought would simply enhance commercial gain, increase the convenience and accuracy of news gathering or reduce expenses. The constitutional justification for access to court records is not thwarted in such situations.

**3.** By removing the seal, the Court expresses no opinion as to the merits of the Complaint.

**4.** Because the Court believes that defendants have not overcome the less stringent burden associated with the common law right, *a fortiori,* defendants have not met the more compelling standards that accompany potential infringement of First Amendment rights. Therefore, this Court need not address the constitutional implications of defendants' request. However, other constitutional issues could arise under the facts of this case, such as the standard for determination of the extent of the public's right to information in a civil case. *See Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d 1165 *reh'g denied,* 717 F.2d 963 (6th Cir.1983).

intimidation should appropriately be addressed at trial or in Motions to Dismiss, for Summary Judgment and/or for Rule 11 Sanctions.

Defendants contend, however, that the allegedly false statements contained in the Complaint potentially would cause harm to both public and private interests. The claimed private harm consists mainly of sensitive and potentially embarrassing allegations. It is said that such private interests would be harmed because of possible diminution in the value of stock in a publicly traded corporation, and possible adverse impact upon the ability of Mountain Fuel Supply to retain or attract investors. Even if such were true, the Court is not persuaded that such harm outweighs the public's right of access to the court documents, let alone the right to know the allegations of the Complaint. With the passage of the RICO and RICE statutes has come a wave of lawsuits involving major corporations whose reputations have been and continue to be affected by allegations alone. Yet, such reputational damage, which often translates into lost dollars, alone "is not sufficient to overcome the strong common law presumption in favor of public access to court ... records." *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179, *reh'g denied*, 717 F.2d 963 (6th Cir. 1983). Defendants' claim of potential harm to public interests if the Complaint is unsealed is not clear. Ostensibly, the harm would be a decline in the quality or quantity of services to the public because of possible reduction of defendants' ability to attract investors. That argument is not persuasive.[5] In fact, the public interest in having access to the complaint is strengthened by the allegations—a publicly regulated corporation being accused of widespread contamination and pollution of various land sites in Salt Lake City to the potential detriment of the public.

Balancing the interests of the parties and the interests of the public, the Court is of the opinion that defendants have not overcome the common law right and interest in public access to the Complaint herein with a sufficient showing of private or public harm. The private harm alleged is insufficient to justify continuation of the sealing order, and the public harm, if any, is extremely speculative. In fact, the interests of the public mitigate against sealing the Complaint. For these reasons, the file containing the Complaint herein should be unsealed.

IT IS SO ORDERED.

---

5. This is not to say that the public right of access to the Complaint is absolute. The Court simply does not perceive the defendants' or the public's plight to be extraordinary were the Complaint to be unsealed in this case. An ex-ample of a situation that might call for sealing a Complaint would be where public access and knowledge potentially would cause an unwarranted run on bank deposits.