**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**BROWN & WILLIAMSON TOBACCO CORPORATION, Defendant.**

**Civ. A. No. 83–1940.**

United States District Court,
District of Columbia.

Oct. 14, 1983.

John H. Carley, Jerold D. Cummins, Judith P. Wilkenfeld, Joel Winston, Melvin Orlans, F.T.C., Washington, D.C., for plaintiff.

Martin London, Martin Flumenbaum, Elizabeth Kolton, New York City and Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This is an enforcement proceeding brought by the Federal Trade Commission ("FTC") pursuant to section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin Brown & Williamson Tobacco Corporation ("B & W") from deceptively advertising the tar content of the Barclay king-size cigarette, which B & W advertises as "1 mg. tar" and "99% tar free." [1] The FTC charges that Barclay advertising violates Section 5(a) of the FTC Act, which prohibits unfair methods of competition and unfair or deceptive acts or practices in commerce. 15 U.S.C. § 45(a).[2] After receiving numerous affidavits, hearing the testimony of six witnesses, and considering the briefs and arguments of counsel, the case is now before the Court for final judgment on the merits.[3] The Court's findings of fact and conclusions of law follow.

1. The present suit challenges the "1 mg. tar" and "99% tar free" claims as used in all Barclay advertising. Evidence at trial focused on Barclay magazine advertisements, Gov.Ex. 26 and Atts. 83–86 to Gov.Ex. 3, and advertising on the Barclay cigarette package, Def.Ex. 40.

   In many instances, such as here, the Court refers the reader to where in the record evidence relating to a particular aspect of the case may be found. No attempt is made to cite every portion of the record upon which the Court relies to support the conclusions reached.

2. The parties do not dispute the proper standards to be applied under § 5 of the Act. An advertisement may be deceptive within the meaning of § 5 if it has "a tendency and capacity to convey misleading impressions to consumers even though other nonmisleading interpretations may also be possible." *Chrysler Corp. v. FTC,* 561 F.2d 357, 363 (D.C.Cir.1977). "The impression created by the advertising, not its literal truth or falsity, is the desideratum." *American Home Products Corp. v. FTC,* 695 F.2d 681, 687 (3d Cir.1982).

3. A hearing was originally scheduled on the FTC's motion for a preliminary injunction, to be resolved on affidavits and testimony from two expert witnesses for each party. As the hearing

The FTC periodically publishes reports which rate the amount of tar and nicotine of each cigarette sold in the United States.[4] These official figures, reported in milligrams, are determined by the FTC using a smoking machine which measures the amount of tar and nicotine the cigarette delivers. The FTC smoking machine does not and is not intended to duplicate actual smoking behavior. Rather, it smokes each cigarette in an identical way, using a standard set of "puff parameters."[5] Since no smoker can or would smoke exactly like the machine,[6] this test method does not measure how much tar and nicotine a smoker would actually take into his mouth were he to smoke a given cigarette. It does purport, however, to tell a smoker the relative amounts of tar and nicotine he would receive in his mouth if he smoked two cigarettes in the same manner. Thus, if a smoker smoked a "10 mg. tar" cigarette in the identical manner as a "5 mg. tar" cigarette, he would get approximately twice as much tar in his mouth from the former as he would from the latter.

For over ten years cigarette companies have publicized these official FTC ratings

progressed each party stated its willingness to proceed to final judgment on the record. Tr. 413. The Court asked to hear testimony from consumer research experts from each side and the case was then submitted on the pretrial briefs after full argument. The Commission presented oral testimony from Drs. Fred Bock, Michael Guerin, and Edward Popper. B & W presented oral testimony from Drs. Gio Gori and Jacques Van Rossum and Mr. Alfred Vogel.

4. The latest FTC Report can be found at 48 Fed.Reg. 13,268 (March 30, 1983), as amended by Notice of April 13, 1983, 48 Fed.Reg. 15,953, *clarified* 48 Fed.Reg. 22,992 (May 23, 1983). *See also* Gov.Ex. 18.

5. The methodology of the FTC testing procedure is described in Gov.Ex. 5 (aff. of Harold Pillsbury) at ¶¶ 2–5. The FTC machine is calibrated to take "puffs" of a certain duration and volume, and to smoke the cigarette to a certain "butt length."

6. B & W has made much of the fact that no individual smokes in the same standardized manner as the machine. Its own expert conceded, however, that such standardization is necessary in order to obtain valid testing results. Tr. 613–614 (testimony of Dr. Van Rossum).

in advertising and on some cigarette packages pursuant to a voluntary agreement with the Commission.[7] Many cigarette smokers note and rely on these FTC ratings in making their decision to purchase a particular brand. Cigarettes with low tar and nicotine ratings are generally considered by smokers to be relatively less risky to health and cigarette companies emphasize low ratings to promote certain brands.[8] B & W undertook a major promotional campaign when it introduced its new Barclay cigarette in 1981, emphasizing its then official FTC rating of 1 mg. of tar and claiming that Barclay was "99% tar free." The cigarette was widely accepted by consumers.[9]

Most "low tar" cigarettes obtain their low ratings in part by diluting the smoke which the smoker takes in through the tobacco rod with outside air.[10] Typically this is accomplished by vents or perforations near the point where the tobacco rod meets the cigarette filter, so that the smoke drawn through the rod and the outside air drawn through the vents or perforations are mixed together as they pass through the filter before entering the smoker's mouth. The Barclay cigarette, however, uses a different dilution process based on a unique design. The outside air is channeled through the filter tip separately from the smoke by means of four separate, sealed longitudinal vents in the filter itself. This causes the outside air to be drawn directly into the smoker's mouth before it mingles with the smoke drawn through the cigarette. Because of this design, the exit holes for the outside air vents are placed in close proximity to the smoker's lips.[11]

In the December, 1981, FTC Report the Barclay cigarette received an official FTC rating of 1 mg. tar based on the standard test using the FTC smoking machine.[12] Following Barclay's successful introduction into the market, however, R.J. Reynolds and Philip Morris, the industry's two largest companies, complained that in actual smoking the Barclay vents were being "crushed" by lip pressure and/or blocked by lip "drapage" so that dilution with outside air was being reduced and the tar delivered by the Barclay cigarette to the mouth of the smoker was thus substantially greater than the amount the FTC machine tests reflected. Thereafter the FTC commenced an extensive investigation, soliciting and examining studies prepared by B & W and by its competitors, and sending these studies to several recognized outside experts for review.[13]

---

7. The voluntary agreement was entered into by the major United States tobacco companies after the FTC initiated a Trade Regulation Rule Proceeding in 1970 and this proceeding was eventually dropped as a result of the agreement. The history of the FTC testing program and the adoption of the agreement are detailed in Gov.Ex. 3 (aff. of Wallace Snyder) at ¶¶ 3–11, and the agreement is reproduced as Att. 3 to Gov.Ex. 3. Neither party to the present proceeding contends that the voluntary agreement has legal effect.

8. B & W attempted at trial to dispute reliance on ratings by consumers and cigarette manufacturers. In a related proceeding, however, B & W explicitly conceded this point. "The public has come to accept and rely upon those numbers, and the cigarette companies have molded massive advertising and marketing strategies around those numbers. They have become a vital part of the industry." Complaint ¶ 14, *Brown & Williamson Tobacco Corp. v. FTC,* No. C 82–0373–L(B) (W.D.Ky.1982). Att. 75 to Gov.Ex. 3. *See also* Att. 76 to Gov.Ex. 3 (Aff. of

Scott Wallace, Senior Vice President-Marketing of B & W) at ¶ 6; Att. 46 to Gov.Ex. 3 (B & W submission to FTC dated Feb. 16, 1982) at 20.

9. Def.Ex. 15 (aff. of Ernest Pepples) at ¶¶ 22, 25.

10. A filter cigarette consists of a tobacco "rod" which contains the tobacco itself, and a filter through which the smoke from the tobacco rod must pass before entering the smoker's mouth.

11. Diagrams showing the construction of a conventional filter and of the Barclay filter are found in Att. 11 to Gov.Ex. 3.

12. Att. 40 to Gov.Ex. 3.

13. The FTC investigation of Barclay is summarized in Gov.Ex. 3, (aff. of Mr. Snyder) at ¶¶ 13–45. The selection of Drs. Bock, Guerin, and Kozlowski as outside consultants is described in Gov.Ex. 11 (aff. of Mathew Myers). B & W did not object to the selection of Dr. Bock or Dr. Guerin, but did object to Dr. Kozlowski. *Id.,* at ¶¶ 4–6.

On June 25, 1982, the FTC determined that Barclay was not accurately assessed by the FTC machine method and directed that a *Federal Register* notice be issued amending the December, 1981, FTC Report to reflect this conclusion. The same day B & W filed suit in federal district court in Kentucky, and obtained an injunction which prevented the FTC from publishing its notice in the *Federal Register* or from initiating any enforcement action. On April 1, 1983, the injunction was dissolved by the United States Court of Appeals for the Sixth Circuit pending appeal, and on April 13, 1983, the FTC announced in the *Federal Register* that its testing methods were inadequate to test the Barclay cigarette with accuracy, that based on the evidence before it the Commission estimated Barclay was more properly rated from 3 to 7 mgs. of tar rather than 1 mg. as originally reported, and that until new testing methods were developed the FTC would no longer report an official rating for the Barclay cigarette.[14] On June 24, 1983, the Sixth Circuit held that the Commission did not act arbitrarily or capriciously in revoking Barclay's rating.[15]

In response to the FTC's action, B & W has deleted from its advertising any direct reference to an FTC rating and its advertisements now state that Barclay is 1 mg. tar "by a recognized method used by B & W and supported by independent laboratories."[16] While conceding the literal truth of this advertising claim, the FTC asserts that the Barclay claim is still deceptive because it falsely suggests to consumers that Barclay is officially rated 1 mg. by the FTC and because it leads consumers to believe, incorrectly, that Barclay's tar deliv-

ery is comparable to that of other cigarettes rated 1 mg. by the FTC. Moreover, while also conceding the literal truth of Barclay's "99% tar free" slogan, the FTC asserts that this claim is also misleading because it falsely suggests that Barclay is "virtually free of tar."

In opposing the injunction B & W has vigorously presented a number of defenses. Despite the longstanding acceptance of the FTC rating system by B & W and other major U.S. cigarette companies, B & W contends that recent scientific evidence demonstrates that the FTC system is so flawed that it is itself deceptive. Accordingly, B & W urges that the FTC cannot ask for equitable relief even if its factual assertions are true. As a second major defense, B & W argues that the FTC has failed to carry its burden of showing that consumers perceive Barclay ads in the manner the FTC contends. Finally, B & W argues that even if consumers do perceive B & W to be making the claim that Barclay delivers the same amount of tar as other cigarettes rated 1 mg., such a claim cannot be deceptive because it is in fact true.

A. *The FTC Rating System.*

The FTC rating system has enjoyed almost universal acceptance for over a decade. Recently, however, the system has been subjected to criticism, largely but not entirely in connection with the Barclay controversy. Seeking to defeat the present suit by demonstrating that the entire FTC rating system is itself misleading, B & W has presented to the Court several "cotinine" studies. Such studies measure by indirect means the amount of nicotine a smoker actually ingests.[17] The principal

---

**14.** 48 Fed.Reg. 15,953 (April 13, 1983).

**15.** *Brown & Williamson Tobbaco Corp. v. FTC,* 710 F.2d 1165, rehearing and rehearing en banc denied, 717 F.2d 963 (6th Cir.1983). Att. 81 to Gov.Ex. 3. The FTC is now in the initial stages of an inquiry looking toward improvement of its testing and rating procedures and has sought comments from the industry and from the public. Both parties recognize that years may pass before a new FTC rating system is in effect.

**16.** *See* note 1, *supra.*

**17.** Cotinine, a metabolite of nicotine, has a longer half-life in the bloodstream than nicotine and thus can be more easily measured. Existing scientific data supports the conclusion that cotinine is a reliable "marker" for nicotine; by determining the level of cotinine, therefore, it is possible to determine the level of nicotine with an acceptable degree of accuracy. *See* Def.Ex. 35 (Aff. of Dr. Renato Galeazzi). There appears to be no dispute on this point. *See* Tr. 279–280 (testimony of Dr. Guerin).

studies upon which B & W relies are an "800-person" study conducted by Dr. Gio Gori, a B & W consultant, and a study by Dr. Neal Benowitz.[18]

The Gori and Benowitz studies undoubtedly suggest that small differences in FTC ratings may not be as significant as many would believe. The Gori study found that between cigarettes whose FTC nicotine ratings differed by a factor of seven, differences in smokers' blood cotinine levels averaged only 30–40%.[19] The principal explanation offered for this effect is that many smokers "compensate"—they change their smoking habits to receive more tar and nicotine from low-rated cigarettes and less tar and nicotine from high-rated cigarettes than the FTC ratings would suggest.[20]

This evidence, however, is not sufficient to lead the Court to hold that the FTC system is meaningless or deceptive. First, the Gori study does in fact validate the FTC system at least to a certain extent by demonstrating that a positive relationship exists between nominal FTC ratings and blood levels of nicotine.[21] Even if the levels of tar and nicotine differ by only 30–40%, this difference has significant health implications, as Dr. Gori acknowledged in his testimony.[22] Exactly how small a difference is of significance is impossible to determine given the current state of scientific knowledge,[23] and it is possible that even very small differences might account for a significant number of early deaths across the nation.[24] Furthermore, because

the relatively small difference in nicotine levels between the high and low FTC-rated cigarettes is due in part to the manner in which they are smoked—the "compensation" effect—a smoker who avoids engaging in compensatory behavior would still receive tar and nicotine into his mouth in rough proportion to the FTC numbers. Even accepting Dr. Gori's results, his study thus fails to discredit the FTC system.

A second reason exists for finding that B & W has failed to demonstrate that the FTC system is not of value to consumers. The FTC system attempts only to determine how much relative tar and nicotine a smoker would get in his mouth were he to smoke two cigarettes in the same manner. B & W has utterly failed to show that the system does not do this. Nor has it shown that a better method for determining the relative health hazards of the many different varieties of cigarettes on the market is currently feasible. Dr. Gori, while arguing for the use of cotinine studies rather than the current rating system, estimated it would take a study using 40,000 people to test properly the brands of cigarettes now rated by the FTC.[25] Moreover, even such a massive and expensive study would leave unanswered questions. The cotinine method measures only the amount of nicotine a smoker ingests. The major health danger to smokers comes not from the ingestion of nicotine, however, but from the ingestion and retention of tar in the body.[26] Because

**18.** Gori and Lynch, *Smoker Intake From Cigarettes of Different Analytical Yields* (draft dated July 27, 1983), Att. E to Def.Ex. 13; Benowitz, *et al.*, *Smokers of Low-Yield Cigarettes Do Not Consume Less Nicotine*, 309 N.Eng.J.Med. 139 (1983), Att. F to Def.Ex. 13.

**19.** Def.Ex. 13 (aff. of Dr. Gori) at ¶¶ 39–40.

**20.** Def.Ex. 22 (aff. of Dr. Paul Daenens) at ¶ 11; Def.Ex. 27 (aff. of Dr. Paul De Schepper) at ¶ 8; Def.Ex. 13 (aff. of Dr. Gori) at ¶ 40.

**21.** *See* Gov.Ex. 1 (aff. of Dr. Bock) at ¶¶ 41, 43; Tr. 210 (testimony of Dr. Bock). The Benowitz study concluded that "smokers of low-nicotine cigarettes do not consume less nicotine." Att. F to Def.Ex. 13 at 139. The Benowitz study, however, appears less reliable than the study performed by Dr. Gori, and the Court has therefore

accorded the Benowitz study relatively little weight. *See* Gov.Ex. 1 (aff. of Dr. Bock) at ¶ 42.

**22.** Tr. 557 (testimony of Dr. Gori).

**23.** Tr. 217 (testimony of Dr. Bock).

**24.** Dr. Bock testified that even accepting Dr. Gori's conclusion that between high and low tar cigarettes a difference of only 30–40% in actual nicotine intake exists, such a difference could still account for 100,000 early deaths a year. Tr. 213–214.

**25.** Tr. 478–479 (testimony of Dr. Gori).

**26.** Tar consists of a myriad of microscopic particles that are drawn into the smoker's mouth, along with nicotine. When smoke is inhaled

actual tar ingestion cannot be directly measured by any known process,[27] in order to derive tar data from the cotinine experiments it is necessary to calculate a "tar/nicotine" ratio for each brand based on independent experiments. How this ratio can properly be determined is the subject of scientific dispute,[28] and the issue has yet to be resolved.

■ Although serious questions have been raised, it is thus too early to sound the death knell for the current FTC rating system. While the FTC system is in need of improvement, on the evidence before it the Court concludes that the system does provide legitimate comparative information to consumers who wish to reduce the health hazards the Surgeon General has concluded are inherent in cigarette smoking.

### B. Barclay's "1 mg. Tar" Claim.

■ Although the 1970 voluntary agreement to publish FTC ratings has no legal effect, as a result of industry adherence to the agreement consumers have for years been exposed to only FTC ratings [29] and have come to rely upon these ratings on the understanding that they all derive from this one official source.[30] B & W's change in the wording of its advertising legend, deleting specific reference to the FTC testing method, is not sufficient to put consumers on notice that the rating given is not an official FTC rating.[31] Furthermore, the Barclay cigarette package makes no mention of any rating system at all, but

some of these tar particles are retained in the smoker's lungs and body. Cancer, the health hazard smokers most fear, is attributable to this ingestion of tar. The amount of tar a given smoker ingests and retains depends on a wide variety of factors peculiar to the individual, including the manner and frequency of smoking and the individual smoker's metabolic process.

27. Tr. 617–618 (testimony of Dr. Van Rossum); Def.Ex. 13 (aff. of Dr. Gori) at ¶ 45.

28. See Tr. 64, 86 (testimony of Dr. Bock); Tr. 375–377 (testimony of Dr. Guerin); Tr. 566–568 (testimony of Dr. Gori).

29. B & W has brought to the Court's attention several recent ads for different cigarettes which carry both FTC numbers and lower numbers given by the manufacturer, as well as cigarette packages with the lower non-FTC ratings. These cigarettes, however, were rated "less than .5 mg.," the lowest rating the FTC gives, and the manufacturers' lower rating numbers are thus not inconsistent with the FTC rating. The FTC has represented to the Court that it has not brought suit against all such claims because, unlike the Barclay ads, these ads give numbers which the FTC believes may be correct and because relatively few consumers purchase such brands and hence any harm to the public interest is not great. Without condoning the FTC's exercise of its prosecutorial discretion in this respect, the Court concludes that the failure to pursue a possible action to halt such advertising is not of such significance as to justify barring equitable relief in this suit under the "clean hands" doctrine, as B & W would have the Court do. Furthermore, there is no reason to believe that these isolated incidents have altered the public's general understanding that tar and milligram ratings in cigarette advertisements are official FTC ratings.

30. As B & W points out, and as the FTC concedes, Gov.Ex. 10 (aff. of Dr. Popper) ¶ 25, there are no studies which consider how consumers perceive the FTC system. Although such consumer survey evidence would be useful, it is not necessary in order to establish a violation of § 5 of the Act. See American Home Products Corp., supra, 695 F.2d at 687 n. 10 (3d Cir.1982), and cases cited therein. The Court finds that the evidence in the present record amply supports the conclusion that consumers are aware of and rely on FTC ratings. First, B & W has conceded this fact in the related proceedings in federal court in Kentucky. See Note 8, supra. Second, the fact that cigarette companies spend millions of dollars advertising low FTC ratings allows the inference that marketing experience demonstrates reliance by consumers on such information in making purchasing decisions. Finally, the Court heard expert testimony supporting this conclusion. Tr. 849 (testimony of Dr. Popper).

31. Dr. Popper testified that after 12 years of exposure to FTC ratings consumers have become "habituated" to the tar and nicotine "legends" in cigarette advertisements, and hence will only pay attention to those portions of the legend which they expect to change from ad to ad—the numerical tar and nicotine ratings themselves. A consumer reading the Barclay ad would be likely either not to read the wording of the legend, or not realize that the terminology employed signified a departure from the long-utilized FTC Report numerical ratings. Tr. 830–833.

only states "1 mg. tar." Consumers will naturally assume, incorrectly, that this represents an official rating.[32] Barclay advertising is therefore deceptive in that it leads consumers to believe that Barclay is rated 1 mg. by the FTC.

This situation might be cured by requiring Barclay to carry a legend which specifically states that Barclay does not have an FTC rating. The FTC urges, however, that the "1 mg." claim must be eliminated altogether. Since to a consumer a milligram tar rating has no significance except in relation to other such ratings, a rating number standing alone or based on a different rating scale gives no useful information about relative health risk.[33] It can only be understood in reference to ratings found in other cigarette advertisements, which are FTC ratings. Thus even if consumers were informed that Barclay's rating is not government approved and that, indeed, the government has withdrawn Barclay's rating, they would still take Barclay's "1 mg." designation to be a claim that Barclay delivers to the smoker the same amount of tar as those cigarettes rated 1 mg. by the FTC. The accuracy of such a claim is the principal dispute underlying the entire Barclay controversy.

The evidence presented by the FTC demonstrates that Barclay delivers to the smoker's mouth significantly more tar than other cigarettes with a 1 mg. FTC rating. The so-called "ventilation" studies submitted to the FTC by R.J. Reynolds and Philip Morris and reviewed by the Commission's independent experts show that, unlike with other cigarettes, dilution of Barclay smoke with outside air through the cigarette's ventilation mechanism is greatly reduced in human smoking as compared to machine smoking.[34] The principal theory relied upon to explain this phenomenon is that smokers unconsciously and inevitably "drape" their lip tissue over the exit openings in the Barclay longitudinal vents, thus cutting off or reducing the flow of outside air into the mouth.[35] As a result, the "puff" which the smoker draws into his mouth contains a higher percentage of air drawn through the tar-containing tobacco rod, thus increasing the net amount of tar in the puff of smoke which enters the smoker's mouth. Other cigarettes, with their more conventional construction, are not susceptible to this phenomenon.

B & W attacked these studies on the ground that they are merely laboratory experiments and do not provide useful information about actual smoking behavior. Scientific experiments, of course, are often

**32.** Tr. 924–926 (testimony of Mr. Vogel).

**33.** Gov.Ex. 10 (aff. of Dr. Popper) at ¶ 24.

**34.** The Philip Morris study was conducted by the United States Testing Company, Inc., an independent testing laboratory. Att. 44 to Gov.Ex. 3. In the study smokers "puffed" on several brands of cigarettes, including their regular brand. For each brand the smoker took puffs first with the cigarette protected by a tip which prevented the smoker from blocking any part of the cigarette filter, and then without the protective tip. A testing apparatus attached to the cigarette then measured how much the air drawn through the tobacco rod was diluted with air drawn through the venting system. While the degree of dilution varied from brand to brand, for each brand except Barclay it remained essentially unchanged with or without the protective tip. For Barclay, however, removal of the protective tip resulted in a reduction in ventilation of approximately one-third. See Table I in Part II of U.S. Testing Company Report, *id.*

R.J. Reynolds conducted a similar test comparing dilution of the Barclay and Now cigarettes. While the Now cigarette had an identical dilution ratio when smoked with and without a protective mouthpiece, the Barclay cigarette's ventilation dropped almost 50% when the protective mouthpiece was absent. Att. 45 to Gov.Ex. 3.

**35.** In the early stages of the Barclay controversy both lip drapage and "crushing" of the vents by lip pressure were suggested as possible causes of the Barclay ventilation-reduction phenomenon. B & W has presented evidence that lip pressure is not the culprit, Def.Ex. 30 (aff. of Dr. Roger Kamm), and the FTC now relies on the lip drapage theory. The Court makes no attempt here to ascertain the cause of the Barclay phenomenon with absolute certainty, but concludes that the existence of the ventilation-reduction phenomenon has been demonstrated, and it is apparently attributable to Barclay's unique venting system. See Tr. 172 (testimony of Dr. Bock).

unable to duplicate real world conditions precisely. The Court accepts the testimony of the Commission's experts that the ventilation studies are useful and scientifically valid.[36] No evidence was introduced which demonstrated that the methodology of the experiments significantly biased the results against Barclay.[37] B & W had most of the test data before it, including videotapes of some of the tests being conducted. There was no evidence that B & W's competitors conducted or sponsored other such tests which have not been revealed.[38]

B & W presented no ventilation studies of its own. The Reynolds and Philip Morris studies were thus the only significant evidence presented to the Court going directly to the question of how much tar Barclay delivers to the human mouth—the question which the FTC method attempts to answer.[39] The Court concludes that the ventilation studies provide strong evidence that Barclay is improperly rated 1 mg. by the FTC testing machine.

B & W points to cotinine studies by Dr. Gori, however, as proof that Barclay delivers into the smoker's body no more tar than other 1 mg. rated cigarettes. The principal Gori study addressing the issue of Barclay's proper rating was the "288-person" study which tested Barclay against other cigarettes rated 1 mg. by the FTC.[40] This study indicated that smokers who smoked Barclay received approximately 1½ to 2 times as much nicotine into their systems as smokers of the other cigarettes tested.[41] Dr. Gori testified that if one applied tar/nicotine ratios obtained for each different cigarette from a separate study to the nicotine figures obtained in his study, one could conclude that Barclay should also be rated approximately 1 mg., as each of the cigarettes tested gave approximately the same amount of tar.[42]

Two factors prevent the Court from giving much weight to this conclusion. The first is the ongoing controversy over the application of tar/nicotine ratios.[43] The second factor, also related to the uncertain-

**36.** Gov.Ex. 1 (aff. of Dr. Bock) at ¶¶ 19–27; Tr. 222–225 (testimony of Dr. Bock); Gov.Ex. 2 (aff. of Dr. Guerin) at ¶¶ 25–26.

**37.** B & W argued that the studies were biased because the apparatus used blocked the perforated intake holes for all cigarettes, a step necessary in order to determine the ventilation readings. Thus only Barclay could be "compromised" through a reduction in ventilation. However, even assuming that some smokers would block the air intake vents consciously or unconsciously, this does not negate the fact that Barclay, and Barclay alone, suffers from the additional problem of blockage of outside air at the filter tip, and that this phenomenon results in a reduction of ventilation for Barclay as compared to other cigarettes. *See* Gov.Ex. 1 (aff. of Dr. Bock) at ¶ 28; Gov.Ex. 2 (aff. of Dr. Guerin) at ¶ 27.

**38.** The Court takes notice of the fact that Reynolds and Philip Morris, the initial instigators of the Barclay controversy, have resisted discovery in the present case. *See* Def.Ex. 25 (aff. of Martin Klotz). They did, however, agree to turn over their research materials compiled specifically in connection with the Barclay investigation. *Id.* at ¶ 6. There is nothing in the record to establish that these companies are harboring additional related scientific documents. As to the scientific data provided by Reynolds and Philip Morris, the Court has therefore felt able to accord such evidence significant weight. The

Court considers research submitted to the FTC by Reynolds and Philip Morris concerning consumer perceptions of Barclay to be entitled to very little weight, however, because the Court has reason to believe that those companies released only selected portions of such research.

**39.** The Court was presented with additional evidence of relatively minor value. These included infrared studies, "butt" studies, taste tests, fiberoptic tests, and others. Much of this evidence was founded on novel scientific techniques and is subject to significant criticism. *See, e.g.,* Gov.Ex. 2 (aff. of Dr. Guerin) at ¶¶ 29–35. Neither party placed great emphasis on this evidence at the hearing. The Court finds this evidence to be generally inconclusive and of little value in addressing the issue of Barclay's proper rating.

**40.** Gori and Lynch, *Analytical Nicotine Yields As Predictors of Smoker Intake From 1 mg Nominal FTC Tar Cigarettes* (1982), Att. C to Def.Ex. 13. Several similar preliminary studies were also conducted. *See* Def.Ex. 13 (aff. of Dr. Gori) at ¶¶ 20–26.

**41.** Def.Ex. 13 (aff. of Dr. Gori) at ¶ 29.

**42.** Tr. 568–570 (testimony of Dr. Gori).

**43.** *See* Note 28, *supra.*

ty over tar/nicotine ratios, is the possibility of an alternative explanation for the data Dr. Gori obtained. Barclay was tested only against cigarettes rated 1 mg. tar by the FTC and recorded a higher nicotine content than each of the other cigarettes tested, a result which B & W argues is explained by Barclay's higher ratio of nicotine to tar. It is possible, however, that this difference in nicotine delivery resulted not simply from a difference in tar/nicotine ratios but also, in part, because Barclay does in fact have a higher tar and nicotine content than the other cigarettes tested.[44] A smaller cotinine study commissioned by Reynolds, in which Barclay was compared with a 5 mg. cigarette as well as with a 1 mg. cigarette, suggests that this latter explanation may be correct.[45] If so, the Gori 288-person data would not be inconsistent with the ventilation studies presented by the Commission.

■ The Court concludes that the preponderance of the evidence demonstrates that Barclay is in fact improperly rated 1 mg. by the FTC method and that any claim that Barclay is a 1 mg. cigarette is deceptive.[46] The ventilation studies presented by the FTC are the only credible evidence which addressed the question of how much tar a smoker receives in his mouth, the issue the FTC testing method attempts to determine. These studies provide strong evidence that Barclay is improperly rated as 1 mg. because its vent system is "compromised" under actual smoking conditions, unlike the vent systems of other low-tar cigarettes. The evidence presented by B & W failed to refute the ventilation studies and did not provide significant contrary evidence.

### C. Barclay's "99% Tar Free" Claim.

Unlike the dispute concerning the 1 mg. claim, no scientific controversy exists over B & W's claim that Barclay is "99% tar free."[47] The lone issue is how consumers perceive that assertion. The FTC argues that a substantial number of consumers interpret 99% tar free to mean "virtually free of tar," a claim it considers false.[48] B & W contends that the consumer surveys upon which the FTC relies do not support their contention.[49]

■ The evidence clearly shows that consumers do not perceive the "99% tar free" claim as an assertion that Barclay has a particular milligram rating, even when accompanied by a specific milligram rating as in the current advertisement. Indeed, consumers have difficulty even relating the claim to any milligram number.[50] Further-

---

**44.** See Gov.Ex. 1 (aff. of Dr. Bock) at ¶ 36–37.

**45.** A.D. Little, Inc., *Report on Plasma Cotinine Levels in Smokers of Ultra-Low and Low Yield Cigarettes* (1982) at 41–43. Att. 48 to Gov.Ex. 3.

**46.** B & W has suggested that, regardless of the validity of the evidence presented by the FTC, a recent modification of the Barclay design now enables the cigarette to achieve a proper rating of 1 mg. tar. The Court finds, however, that this design change does not prevent the filter "compromise" problem. See Gov.Ex. 2 (aff. of Dr. Guerin) at ¶¶ 40–45; Gov.Ex. 6 (aff. of Mr. Pillsbury).

**47.** A cigarette with a rating of approximately 5 mg. tar or less would be "99% tar free" by weight. Def.Ex. 16 (aff. of M. Lance Reynolds) at ¶¶ 51–54.

**48.** Gov.Ex. 10 (aff. of Dr. Popper) at ¶ 14–21.

**49.** In evaluating the "99% tar free" claim, the Court gives primary consideration to the opinions of the consumer experts presented by each

side and to two consumer surveys, one prepared for the FTC and one prepared for B & W. Audits & Surveys, *FTC Barclay Ad Survey* (June 1983), Att. 6 to Gov.Ex. 10; Market Probe International, Inc., *Consumer Understanding of Two Print Ads for Barclay Cigarettes* (January 12, 1981), Att. B to Def.Ex. 26. Little weight was given to consumer surveys commissioned by R.J. Reynolds and Philip Morris. See footnote 38, *supra*.

**50.** In the Audits & Surveys study prepared for the FTC, of 403 interviewees asked "If you saw the phrase 99% tar free in a cigarette ad, what would that mean to you?", not a single respondent answered 1 mg. tar. Even after being asked to express their answer in terms of milligrams, only six respondents out of 203 who were not exposed to the Barclay ad with its 1 mg. claim answered 1 mg. tar, and only 20 out of 200 respondents who were exposed to the advertisements gave that answer. See questions 5 and 6 in Att. 6 to Gov.Ex. 10. In his testimony the FTC's expert witness on consumer perceptions, Dr. Popper, acknowledged that most peo-

more, there is little support for the FTC's view that consumers understand the claim to assert that Barclay is among the lowest-rated cigarettes. Even the FTC's own consumer survey suggests that the overwhelming majority of consumers perceive "99% tar free" as a general low tar claim.[51] Other evidence before the Court reinforces this interpretation.[52] The Court concludes, therefore, that the FTC has failed to show that Barclay's "99% tar free" claim, unaccompanied by the "1 mg. tar" claim, is deceptive.

### D. *Conclusion.*

The Court finds that B & W's current advertising claim that Barclay is "1 mg. tar" is deceptive within the meaning of 15 U.S.C. § 45(a). The FTC has failed to show, however, that the "99% tar free" claim, unaccompanied by the "1 mg. tar" claim, is also deceptive. Accordingly, the FTC's prayer for relief is granted in part and denied in part. B & W must be permanently enjoined from promoting its Barclay cigarettes by advertising, package layout or other means with any claim of a specific milligram tar content rating, unless such rating is approved by the FTC or derived using a test methodology approved by the FTC for measuring Barclay.[53] Counsel shall immediately confer and present an agreed form of order consistent with the foregoing on or before October 21, 1983. Failing agreement, separate forms of order proposed by each party shall be presented by that date.

ple do not freely associate 99% tar free with a 1 mg. rating. Tr. 769.

**51.** *See* Audits & Surveys, at 4–5, Att. 6 to Gov.Ex. 10; Def.Ex. 24 (aff. of Mr. Charles Sobel) at ¶¶ 13–16.

**52.** *See* Market Probe, at 18–20, Att. B to Def.Ex. 26; Def.Ex. 24 (aff. of Mr. Sobel) at ¶ 12; Def.Ex. 26 (aff. of Mr. Vogel) at ¶ 9.

**53.** B & W is thus free to advertise Barclay as containing 3–7 mg. tar, the estimate which the FTC currently accepts. B & W is under no obligation to use the FTC estimate, however, as the FTC has made no showing of the need for "corrective" advertising.