**FEDERAL TRADE COMMISSION**

v.

**BROWN & WILLIAMSON TOBACCO CORPORATION, Appellant.**

No. 83–2129.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 2, 1984.

Decided Dec. 10, 1985.

Amended Dec. 18, 1985.

Martin London, New York City, for appellant.

Jerold D. Cummins, Deputy Asst. Gen. Counsel, F.T.C., with whom Howard E. Shapiro, Deputy Gen. Counsel, F.T.C., Washington, D.C., was on brief, for appellee.

Before EDWARDS, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge.

The Federal Trade Commission brought this enforcement proceeding in the district court to enjoin the Brown & Williamson Tobacco Corporation ("B & W") from deceptively advertising the tar content of its Barclay king-size cigarettes. B & W advertises these cigarettes as being "1 mg tar by a recognized method used by B & W and supported by independent laboratories." The FTC alleges that Barclay's advertising claim is false and deceptive and so violates section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (1982). The district court agreed and enjoined B & W from advertising any tar number for its Barclay cigarettes without receiving prior FTC approval. Because we find the injunction broader than reasonably necessary to prevent deception, we affirm in part but

remand to the district court to modify the injunction consistent with this opinion.

## I.

Since at least the mid-1950's the FTC has been concerned about the validity of tar and nicotine content claims in cigarette advertising. In 1955 the Commission published cigarette advertising guides advising manufacturers to make no representations about the tar and nicotine content of a cigarette that could not be supported with reliable scientific evidence. By the mid-1960's the FTC became concerned about the absence of a standard method for testing cigarette delivery of tar and nicotine. Accordingly, in 1967 the Commission adopted a testing method and began a program to analyze the tar and nicotine levels of each brand of cigarettes sold in the United States.

The test adopted by the FTC is known as the Cambridge Filter method and is used with minor variations throughout the world. The test utilizes a smoking machine that takes a 35 milliliter puff of two seconds' duration on a cigarette every 60 seconds until the cigarette is smoked to a specified butt length. The tar and nicotine collected by the machine is then weighed and measured. This provides an objective basis for assessing the relative amounts of tar and nicotine different cigarettes will deliver when they are smoked in the same way. The test does not measure the amount of tar or nicotine that any individual smoker may receive since that quantity will depend on individual smoking behavior.

In 1970, the FTC proposed a formal rulemaking in order to promulgate a Trade Regulation Rule requiring disclosure of FTC tar and nicotine ratings in cigarette advertising. Immediately following this proposal, five leading cigarette companies, including B & W, agreed among themselves to a voluntary disclosure plan (the "1970 agreement"). This plan provided that the cigarette manufacturers would disclose the tar and nicotine figures in all advertising for their cigarettes according to the most recently published Commission test results. Upon accepting the 1970 agreement, the FTC indefinitely suspended its rulemaking proceeding.

In January 1981, B & W introduced Barclay cigarettes to the national market. Barclays are ultra low tar cigarettes with an innovative filter design. B & W heavily promoted and advertised its king-size Barclays as 1 milligram ("mg") in tar, which is one of the lowest tar claims made for any cigarette. Pursuant to the 1970 agreement, all Barclay advertisements initially stated that the cigarettes were "1 mg 'tar,' 0.2 mg nicotine by the FTC method." Within six months the Barclay brand had captured more than one percent of the domestic cigarette market.

Shortly after introduction of Barclay, two of B & W's competitors, the R.J. Reynolds Tobacco Company and Philip Morris Incorporated, complained to the FTC that the 1 mg tar claim was inaccurate and misleading. They alleged that the Barclay filter differs from other filters so that "when the cigarette is smoked between human lips its air ventilation system is inevitably obstructed and the cigarette delivers disproportionately more tar and nicotine than other comparably rated cigarettes." Brief for FTC at 6. Because the FTC smoking machine does not reproduce the obstruction caused by human lips, B & W's competitors claimed that it did not accurately rate the Barclay. They also argued that other low tar cigarettes are not subject to this phenomena because they have a different filter design.

The Commission undertook a comprehensive inquiry to determine whether the Barclay cigarette was accurately rated by the current testing method. The Commission solicited evidence from all the major cigarette companies including B & W. In addition, three consultants were retained—each an expert in the chemistry of tobacco use—to assist in evaluating the evidence. The Commission did not otherwise engage in independent efforts to gather evidence or conduct studies but attempted to act as an impartial fact-finding body.

R.J. Reynolds and Philip Morris each submitted studies purporting to show that the tar and nicotine yield of Barclay cigarettes is increased when they are smoked by humans. B & W submitted contrary studies measuring smoke constituents in human plasma and purporting to show that Barclay's FTC ratings correctly reflected the amounts of tar and nicotine actually ingested by Barclay smokers as compared to smokers of competitive 1 mg tar cigarettes. The three FTC consultants—evaluating the studies independently—found that the Barclay cigarette is not properly ranked by the FTC testing method and yields substantially more tar than other comparably rated cigarettes when smoked by humans. Asked to estimate what Barclay's tar rating should be, the consultants gave amounts ranging from 3 mg to 7 mg. These estimates would still place Barclay in the ultra low tar range of cigarettes.

On June 25, 1982, the Commission announced its determination that the FTC testing method does not accurately measure the tar and nicotine delivery of the Barclay. The Commission directed B & W to refrain from relying on the FTC method to substantiate advertising claims concerning Barclay's tar content. The Commission announced that it would publish a notice in the Federal Register requesting comment on how to modify its test to rate the Barclay cigarette accurately. Before this could be done, however, B & W sued to enjoin the Commission from taking its proposed action on the ground that the FTC's exclusion of Barclay from its official testing and reporting program was procedurally and substantively improper. The district court for the Western District of Kentucky granted B & W a temporary restraining order against the FTC's proposed actions and against the publication of those actions in the Federal Register. When the district court in Louisville subsequently dismissed B & W's complaint because the FTC's actions were not final or reviewable, it entered a stay against the Commission pending B & W's appeal to the Sixth Circuit. The Sixth Circuit dissolved the district court's stay and subsequently ruled for the FTC on the merits. *See Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984). The FTC then published notice in the Federal Register seeking public comment on proposals to modify the present testing method and deleting the values listed for Barclay cigarettes in past reports. The Commission also retroactively amended its official December 1981 and March 1983 Tar and Nicotine Reports to delete Barclay's ratings.

B & W declined the FTC's suggestion that it alter its advertisements to use an estimated yield of 3 to 7 mg tar. Instead, B & W continued to label and advertise Barclays as 1 mg tar cigarettes and continued to state prominently that Barclays were "99% tar free" with "1 MG TAR." B & W did, however, revise its fine-print tar and nicotine legend to refer to "a recognized method used by B & W and supported by independent laboratories" rather than, as previously, referring to "the FTC method."

On July 7, 1983, the FTC filed the present action in the United States District Court for the District of Columbia seeking injunctive relief pursuant to section 13(b) of the FTC Act, 15 U.S.C. § 53(b) (1982). The Commission sought permanently to enjoin B & W from continuing to advertise either that Barclay is "1 mg tar by a recognized method used by B & W and supported by independent laboratories" or that it is "99% tar free." The FTC's complaint alleged that Barclay's advertising was false and deceptive when considered against the background of the Commission's rating system for tar and nicotine. The FTC claimed that the Barclay advertisements would mislead consumers into believing both that "Barclay delivers approximately the same amount of tar to human smokers as other cigarettes rated 1 mg tar, when smoked in the same manner, *and* that Barclay's 1 mg tar designation is an official government rating." Brief for FTC at 16 (emphasis added).

The district court held that B & W's claim that Barclay is a 1 mg tar cigarette is false and deceptive under the FTC Act. *FTC v. Brown & Williamson Tobacco Corp.*, 580 F.Supp. 981 (D.D.C.1983). The opinion reviewed B & W's evidence indicating that the FTC's rating system does not accurately reflect the proportionate amounts of tar and nicotine delivered by different cigarettes when smoked by humans rather than machines. The judge found that B & W had raised serious questions about the system's utility. Nonetheless, the judge found that the system does provide some useful comparative information to consumers who wish to reduce health hazards. *Id.* at 985–86. In addition, he found that B & W was unable to suggest a superior alternative method of ranking cigarettes for their health-threatening qualities.

In evaluating Barclay's "1 mg. tar" claim, the district judge held that this claim would mislead consumers who over the years have come to rely on the FTC's cigarette rating system. 580 F.Supp. at 986–89. He found that "B & W's change in the wording of its advertising legend, deleting specific reference to the FTC testing method, is not sufficient to put consumers on notice that the rating given is not an official FTC rating." *Id.* at 986. The judge concluded that the FTC had succeeded in demonstrating that Barclay was "improperly rated 1 mg by the FTC method and that any claim that Barclay is a 1 mg. cigarette is deceptive." *Id.* at 989. He enjoined further use of the "1 mg. tar" claim.

In evaluating Barclay's "99% tar free" claim, the judge concluded that consumer surveys relied on by the FTC did *not* indicate that this claim was deceptive. 580 F.Supp. at 989–90. Because consumers had difficulty "relating the claim to any milligram number," he found that "99% tar free" was perceived only as "a general low tar claim." *Id.* at 990. Accordingly, the "99% tar free" claim was upheld so long as it was not accompanied by the "1 mg. tar" claim. Judgment was entered on October 25, 1983, and the following permanent injunction was put into effect:

ORDERED, ADJUDGED AND DECREED:

1. Defendant is permanently enjoined from representing in any advertising, including packaging and labeling, any specific milligram tar yield or content of any variety of Barclay cigarettes, including the representation that Barclay cigarettes are 1 mg. tar, unless such rating is approved or accepted by the Federal Trade Commission, or derived using a test methodology approved by the Federal Trade Commission for Barclay.

2. Except as set forth in paragraph 1 of this Order and Judgment, plaintiff's prayer for relief in all other respects is denied. Defendant is free to represent in advertisements that Barclay is "99% tar free" and/or "ultra low tar," and defendant shall not be required to advertise any milligram tar yield for Barclay cigarettes under the present Federal Trade Commission-approved voluntary rating program now in effect.

Joint Appendix ("J.A.") at 61. The district court further announced that it would "retain jurisdiction over this action for any such purposes as justice may require." *Id.* at 62. B & W has appealed to this court.

## II.

B & W's principal claim on appeal is that the district court erred as a matter of law in not requiring direct survey evidence of consumer deception. B & W claims that without such evidence, the district court had no basis for determining that consumers are deceived by the "1 mg. tar" claim or for determining that this deception is material. In addition, B & W asserts that the district court's permanent injunction is a sweeping prior restraint on constitutionally protected commercial speech. B & W asks that the injunction be vacated and replaced by a remedy no more restrictive than necessary to prevent the deception shown. We address each of B & W's contentions in turn.

### A.

In considering charges of false and deceptive advertising, "the public's impres-

sion is the only true measure of deceptiveness." 1A L. Altman, *Callman's The Law of Unfair Competition, Trademarks and Monopolies* § 5.04, at 5–32 (4th ed. 1981) (footnote omitted). Appellant notes that much of the jurisprudence of false advertising emphasizes the importance of "examining ... consumer data" to determine the consumer's understanding of the advertisement at issue, if the language of the advertisement is ambiguous and the deception not, therefore, facially apparent.[1] *See, e.g., American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 166 (2d Cir. 1978) (Lanham Act).[2] We accept the general desirability of having some empirical evidence of consumer perception, but we do not accept appellant's contention that consumer survey evidence must, as a matter of law, be presented to support a finding that an advertisement has a tendency to deceive and violates section 5 of the FTC Act.

The Lanham Act false advertising cases relied on by appellant clearly do suggest

that if "the language of the advertisement is not unambiguous," then the trial judge may be "compelled to examine consumer data to determine first the message conveyed." *See American Home Products*, 577 F.2d at 164–66. Thus, if the lower court confronts an advertisement involving "literally true or grammatically correct" statements, the trial judge cannot make a finding of deceptiveness unless the parties provide "evidence of substance" about what "the person to whom the advertisement is addressed find[s] to be the message." *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1357 (S.D.N.Y.1976) (Lanham Act).

We do not mean that consumer survey data must always underlie any finding of tendency to deceive in such cases. Evidence of consumer reaction "usually [takes] ... the form of market research or consumer surveys," *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 525 (S.D.N.Y.1980), but a trial court may accord other forms of evidence

---

**1.** We need not decide whether the FTC may bear a lower burden of proof in § 5 false and deceptive advertising cases brought before the agency itself rather than before a district court. Because of the Commission's accumulated expertise in such matters, a reviewing court may refuse to overturn an FTC adjudication of false advertising where it would reject such a finding by a district court relying on similar evidence of deception. *See, e.g., Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1142 (9th Cir.1978). This does not, however, change the fact that, as an appellate court sitting in review of a district court's factual determinations, such as a finding of the inherent tendency of the "1 mg. tar" legend to deceive, we must apply the narrow "clearly erroneous" standard.

**2.** *American Home Products* and other cases relied on by appellant in attacking the lower court's findings arise under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), which states in relevant part:

Any person who shall ... use in connection with any goods ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods ... to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

By contrast, § 5(a)(1) of the FTC Act declares "unlawful" any "[u]nfair methods of competition ... and unfair or deceptive practices in or affecting commerce." *See* 15 U.S.C. § 45(a)(1) (1982). Both statutes, however, attack false advertising, and, more importantly for the case at bar, both address advertisements that, while not "literally false," create a capacity or tendency to deceive the consumer. *Compare American Home Products*, 577 F.2d at 165 (Lanham Act) *with FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674–75 (2d Cir.1963) (FTC Act). Thus, owing to the paucity of cases involving *de novo* trial court proceedings under the FTC Act, we look to Lanham Act cases for guidance as to evidentiary requirements to establish "tendency to deceive."

The FTC argues that pronouncements in Lanham Act cases regarding the evidentiary value of empirical consumer data should not apply in this case. Brief for FTC at 30–31. We disagree. Although appellee accurately distinguishes the Lanham Act from the FTC Act insofar as the two statutory schemes have divergent purposes, we find the difference not to be significant for the evidentiary point at stake here. The Lanham Act does constitute a private remedial scheme for the benefit of disgruntled competitors whereas the FTC Act more specifically serves the public interest and is enforced by the FTC; but in both instances, the factual predicate for the cause of action rests in deception of the public.

"substantial weight" if that evidence appears reliable. *See American Home Products,* 577 F.2d at 167. A court may give weight to expert testimony provided by the parties, *see id.,* as long as· it is not frivolous. *See American Brands,* 413 F.Supp. at 1357 (refusing to credit the testimony of plaintiff's sales manager because it was based only upon "three or four casual conversations with smokers"); *see also* 1A L. Altman, *supra* p. 40, § 5.16, at 5–92 ("[T]hose who customarily deal with ... purchasers ... are qualified to testify with respect to the buyers' understanding of the words they hear and use.") (footnote omitted). Indeed, courts and commentators have recognized the inherent weaknesses that may characterize a consumer survey and its mode of construction, *see, e.g., American Home Products,* 577 F.2d at 167; *Developments in the Law—Deceptive Advertising,* 80 Harv.L.Rev. 1005, 1077 (1967), and a "court *must* [also] ... rely on its own experience and understanding of human nature in drawing reasonable inferences about the reactions of consumers to the challenged advertising." *McNeilab,* 501 F.Supp. at 525 (emphasis added).

The Supreme Court this past Term in *Zauderer v. Office of Disciplinary Counsel,* —— U.S. ——, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), suggested that when the alleged deception rises to "a commonplace," a court may itself find the deception "self-evident." *Id.,* 105 S.Ct. at 2283. The Court implied that in situations involving "technical ... terms," it may become reasonable to assume that members of the public may be "unaware of the ... meanings of such terms" and that "substantial

numbers" might be misled. *Id.* While the Court did not go so far as to state that a judge may make such a finding without evidence, the opinion's "self-evident" language seems to give a court considerable leeway, and the opinion explicitly stated that if a court finds the deception "self-evident," no survey data are required. *Id.*

Thus, while consumer surveys conducted by independent experts may arguably constitute the best way to establish consumer understanding and preference, *see* Gellhorn, *Proof of Consumer Deception Before the FTC,* 17 Kan.L.Rev. 559 (1969), *cited in* S. Oppenheim, G. Weston, P. Maggs & R. Schechter, *Unfair Trade Practices and Consumer Protection* 602–04 (4th ed. 1983), such surveys are not the exclusive form of probative evidence of public perception. The "conclusions of market researchers" do not bind the trial court, which must ultimately make a determination of public reaction based upon all "the evidence." *See McNeilab,* 501 F.Supp. at 525. Appellant's contention, therefore, that a consumer survey must be provided as a matter of law is ill-founded.

Unless the district court's finding is "clearly erroneous" we must uphold its conclusion that the "1 mg. tar" claim, although literally true, is inherently deceptive for Barclay cigarettes. *See* Fed.R. Civ.P. 52(a); *American Home Products,* 577 F.2d at 169 (Lanham Act).[3] The claim of inherent deception rests on three factual premises: (1) consumers rely on tar ratings to make comparative assessments of the health effects of cigarettes; (2) Barclay cigarettes deliver disproportionately more

---

3. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), does not change the standard of review in deceptive advertising cases. In that case, the Supreme Court held that appellate courts must "exercise independent judgment and determine whether the record establishes actual malice" in libel cases. *Id.* 104 S.Ct. at 1967. Read broadly, this might imply a requirement of a more searching review than exists under the "clearly erroneous" standard when findings of fact at issue implicate the availability of first amendment protection. Thus findings of tendency to deceive and inherent deceptiveness, which bear on whether com-

mercial speech falls outside the scope of the first amendment, might arguably fall within this category requiring heightened review.

We are reluctant, however, to extend *Bose* to the realm of false and deceptive advertising. First, the implications of *Bose* are far from clear. *See* Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229, 244–47 (1985). More importantly, *Bose* itself suggests that commercial speech might not merit the same approach as set out therein for libel cases. *See* 104 S.Ct. at 1961–62 n. 22. Therefore, we apply the "clearly erroneous" standard in this case.

tar than other similarly rated cigarettes; and (3) disclaimers explaining the difference will prove ineffective. We conclude that the record supports the district court's findings on all three of the factual predicates above, and that none of the findings is "clearly erroneous."

First, with respect to comparative assessments, we think that the likely public reaction is unambiguous, and that consumer survey evidence is not required. No party disputes that these numbers bear significance only insofar as they implicate health matters. That consumers rely on the milligram ratings promulgated pursuant to the FTC rating system is supported by the evidence. The trial court found relevant both a statement B & W made in the related proceedings in the federal court in Kentucky that consumers are aware of and rely on FTC ratings and the fact that cigarette companies, including B & W, spend substantial sums of money advertising tar figures. 580 F.Supp. at 986 n. 30. The court also credited testimony by the FTC's witness, Dr. Popper, who testified about consumer behavior based on his "vast history of research in consumer behavior and social psychology." *See* Testimony of Dr. Popper, J.A. at 168.

■ We cannot say that the finding of reliance based upon this evidence is "clearly erroneous." B & W has had vast experience in cigarette marketing, and its previous statement regarding consumer reliance must not lightly be disregarded. Moreover, the vast expenditure of advertising dollars on tar ratings strongly supports public reliance because advertising expenditures presumptively have the effect intend-

ed. *See McNeilab*, 501 F.Supp. at 530. At least, those who are paying the money and are most familiar with the market believe that consumers are guided by tar ratings. Finally, Dr. Popper's expert testimony may be credited if reliable, *see supra* p. 41, and an appellate court should not second-guess a trial court's judgment as to the reliability of witnesses absent circumstances not present here.

On the question whether consumers use such information comparatively, we find the public's perception to be unambiguous, given the context in which the information appears.[4] Consumers have no innate ability to assess an individual tar claim standing alone. The tar milligram figures have significance only as comparative values. Thus, a consumer can assess Barclay's "1 mg. tar" claim as being like other "1 mg. tar" cigarettes and ordinarily less detrimental to health than cigarettes of higher ratings.

Thus, if the second finding, that Barclay delivers disproportionately more tar than other cigarettes of "1 mg. tar" rating, is not clearly erroneous, the advertisement is inherently deceptive. Because the district court carefully weighed the implications of ventilation studies by R.J. Reynolds and Philip Morris, as well as defendant B & W's own cotinine studies, 580 F.Supp. at 987–89, we will not disturb the court's conclusion regarding disproportionate tar delivery. Thus the finding of inherent deceptiveness is well-supported.

■ As for the third issue—the effectiveness of disavowing any official FTC rating as a way of eliminating the deception—we agree with the district court's

4. *Better Business Bureau v. Medical Directors, Inc.*, 681 F.2d 397 (5th Cir.1982) (Lanham Act), suggests that "context" may create inherent consumer deception even where an advertisement is facially truthful. *Id.* at 403. There, a defendant weight clinic referred to customers who gave the Better Business Bureau ("BBB") voluntary, periodic favorable reports on the clinic as BBB "spies" or "investigators." Technically, the labels were arguably accurate insofar as the customers had informed the BBB of their intentions to provide information, and, unbeknownst to the defendants, acted on the BBB's behalf.

Yet given the context of the BBB's strong role in "encouraging honesty and exposing deception," the labels used by defendant raised a strong "inference of [an] endorsement" that did not exist. *Id.*

In this case, twelve years of well-established and relied upon comparative ratings raise a strong inference of the comparability of all milligram tar ratings. Indeed, in this case the inference appears even stronger because the ratings are meaningless outside the comparative context.

conclusion that no disclaimer can have that effect. *See* 580 F.Supp. at 986.[5] The "1 mg. tar" claim appears more visibly than the legend explaining the source of the ratings as being independent laboratories. This fine-print legend, moreover, often appears in virtually illegible form, placed in an inconspicuous corner of Barclay advertisements. *See* Brief for FTC at 24. More importantly, however, the lower court accepted expert testimony that

> after 12 years of exposure to FTC ratings consumers have become "habituated" to the tar and nicotine "legends" in cigarette advertisements, and hence will only pay attention to those portions of the legend they expect to change from ad to ad—the numerical tar and nicotine ratings themselves. A consumer reading the Barclay ad would be likely either not to read the wording of the legend, or not realize that the terminology employed signified a departure from the long-utilized FTC Report numerical ratings.

580 F.Supp. at 986 n. 31 (citation omitted). We do not find this conclusion to be clearly erroneous.

■ Thus we hold that the district court's conclusions as to the "1 mg. tar" claim's inherent tendency to deceive to be supported by the evidence. The trial court's holding that B & W's advertising violates section 5 of the FTC Act must, therefore, be affirmed.

**B.**

The Supreme Court has placed commercial speech within the ambit of first amendment protection. *See, e.g., Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). Both consumers and society have a strong interest "in the free flow of commercial information," *see Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 763, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976), and it is this interest in ensuring the flow of that information essential

to "the proper allocation of resources" and the regulation of our economy that the first amendment vindicates in extending its scope to commercial speech. *Id.* at 765, 96 S.Ct. at 1827. Yet, "[f]alse, deceptive, or misleading advertising" does not serve, and, in fact, disserves, that interest, and thus the subcategory of commercial speech consisting of false and deceptive advertising "remains subject to restraint." *In re R.M.J.,* 455 U.S. 191, 200, 102 S.Ct. 929, 936, 71 L.Ed.2d 64 (1982). In fact, "[m]isleading advertising may be prohibited entirely." *Id.* at 203, 102 S.Ct. at 937.

■ As appellant has correctly asserted, however, any restrictions imposed on deceptive commercial speech can be no "broader than reasonably necessary to prevent the deception." *In re R.M.J.,* 455 U.S. at 203, 102 S.Ct. at 937. The restriction imposed, moreover, may not "place an absolute prohibition on ... potentially misleading information ... if the information also may be presented in a way that is not deceptive." *Id.* B & W contends that the district court's permanent injunction against B & W's making any specific milligram tar rating claim, unless the FTC approves it or B & W derives it from an FTC-approved methodology, constitutes an impermissibly broad prior restraint on B & W's first amendment rights. Brief of B & W at 50–57. We turn now to this claim.

Contrary to the appellant's implication, the lower court did not impose a "sweeping prohibition" or "blanket injunction[ ]" against any milligram tar claim, subject *only* to the discretion of the FTC. Brief of B & W at 51. In fact, the district court explicitly stated that "B & W is ... free to advertise B & W as containing 3–7 mg. tar, the estimate which the FTC currently accepts." 580 F.Supp. at 990 n. 53. Thus, the injunction merely prevents B & W, absent FTC approval, from advertising Barclay as falling within 1–2 mg tar ratings, or from advertising a specific number within the 3–7 mg tar range, which the

---

5. In fact, B & W did not disclaim comparability with FTC-rated milligram figures *per se.* It merely deleted reference to the specific FTC

testing method in the legend accompanying the numerical rating.

FTC contends and the lower court implicitly accepts to be inherently misleading. Because we believe that the 3–7 mg tar estimate, an amalgam of three separate ranges estimated by FTC consultants in 1982, is not clearly erroneous, we hold that the district court's injunction against advertisement of milligram tar figures below that range is not "broader than reasonably necessary to prevent deception."

Nor does the possibility of the future obsolescence of this currently acceptable 3–7 mg tar range, vulnerable to ongoing research and advancing scientific knowledge, render the district court's disposition of this matter infirm under the first amendment. If the FTC changes its position and refuses pursuant to the terms of the injunction to continue to allow B & W to advertise Barclay in the 3–7 mg tar range, or if the Commission rejects a claim by B & W that lower or more specific tar ratings have become appropriate, either step would entitle B & W to judicial review of this agency action. See 5 U.S.C. §§ 702, 704 (1982); see also Environmental Defense Fund v. Ruckelshaus, 439 F.2d 584, 589 n. 8 (D.C.Cir.1971) (where agency action "imposes an obligation or denies a right," this has sufficient finality for "purposes of review").[6] Thus, a reviewing court will set aside agency refusal to allow a certain milligram tar rating to be advertised if that refusal is "arbitrary, capricious, ... or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1982). This suggests that unreasonable restriction of B & W's right to non-deceptive advertisement of tar ratings for Barclay would be struck down

on appeal of the FTC's refusal to grant permission.

The district court's retention of jurisdiction "for any such purposes as justice may require," see J.A. at 62, moreover, further diminishes any danger that the FTC might unreasonably withhold permission for a specific milligram tar rating which is not deceptive. If B & W believes in the future that the FTC has unreasonably withheld its approval in the face of new scientific evidence, it may petition the court to modify or dissolve the injunction.

There is a problem, however, in the fact that, these safeguards notwithstanding, the injunction places the burden on B & W to justify the advertisement of results from a different system of testing which it considers superior to the FTC system, even if B & W includes a prominent disclaimer explaining that the rating comes from a new system not comparable to that used by the FTC and other manufacturers. Because the FTC has not adopted its system of testing pursuant to a Trade Regulation Rule under section 18 of the FTC Act, 15 U.S.C. § 57a (1982), one cannot say that the FTC system constitutes the only acceptable one available for measuring milligrams of tar per cigarette.

If B & W sought to advertise the results of a different system solely with respect to Barclay, this objection would be groundless. If the different system produces results not comparable to the FTC ratings used by other manufacturers, an advertisement displaying only that system's results for Barclay would have an inherent tendency to deceive, even with an explanatory disclaimer.[7] The sole utility of any particu-

---

6. The review provision of the FTC Act, see 15 U.S.C. § 21(c) (1982), does not apply to such Commission actions. That provision applies only to cease and desist orders brought under 15 U.S.C. § 21(a) to enforce various provisions of Title 15. The FTC does not have to bring a cease-and-desist action to regulate B & W's advertisement of tar ratings; the Commission has explicit veto power over such advertisements under the terms of Judge Gesell's injunction. See 580 F.Supp. at 989. Thus judicial review for FTC refusal under the injunction to allow specific milligram tar advertisements would be obtainable under 5 U.S.C. § 704 (1982) as "final

agency action for which there is no other adequate remedy in a court."

7. In Part II–A of this opinion, we upheld the district court's finding that no disclaimer could cure the inherent deceptiveness at stake. See supra p. 42. We cannot, therefore, order the modification of the injunction to allow the otherwise deceptive advertisement of a rating obtained under a system not comparable to the FTC system simply because B & W appends a disclaimer explaining the disparity of the systems and results.

lar milligram rating is in comparison with the analogous ratings of other cigarettes. Thus, standing alone, the Barclay rating from a new system would tend to encourage comparison with the inapposite FTC ratings advertised by other manufacturers. This would tend to deceive consumers.

 The injunction as written, however, would even prohibit B & W from devising a new testing system and, in advertising its results for Barclay, providing information about competing brands prominently enough and in sufficient quantity to allow consumers to make informed decisions without confusing figures from disparate testing systems. Since this would eliminate consumer confusion, we believe that the FTC must bear the affirmative burden of demonstrating any inadequacy, and thus deceptiveness, of the results obtained under such a system and advertised in the manner described. We do not wish to leave intact the injunction's requirement of prior FTC approval of such advertising because that would enshrine the current FTC system as the sole legitimate testing method, even though it was not passed pursuant to section 18 of the FTC Act, 15 U.S.C. § 57a (1982), and subjected to the possibility of judicial review. Thus we remand this case to the district court with instructions to modify the injunction to allow for the presentation of the results of a different testing system, so long as any advertisement of such results provides sufficient data to avoid deceptiveness due to confusion with the FTC testing system. It hardly requires saying that the FTC would remain free to prove deceptiveness due to the inadequacy of the new testing system or the form of the advertisements under section 5 of the FTC Act. The Commission may, of course, address the problem by promulgating a Trade Regulation Rule under section 18 of the Act.

Finally, we find ourselves unable to accept B & W's remaining first amendment claim that the lower court's decision prevents B & W from airing publicly its dispute with the FTC and its methodology. The decree does no more than prohibit B & W from expressing its dispute in a particular "form" that would be deceptive. *See Friedman*, 440 U.S. at 10, 99 S.Ct. at 894. B & W is free to voice its disagreement with the FTC in every medium except the advertisement of the specific milligram tar ratings which offend the FTC Act's proscription against deceptive advertising.

The judgment below is

*Affirmed in part and remanded in part.*